HEARD NOVEMBER TERM, 1875.

## THE STATE *vs.* NERLAND.

Where the law relating to a special election to determine the location of a County seat provided that the result of the election should be ascertained by the certificate of the County Board of Canvassers, consisting of three Commissioners of Election, and such Board adjourned without canvassing the votes or giving the certificate: *Held*, That the election remained undetermined, although after the Board had adjourned a single member thereof had given a certificate of the result from secondary evidence, stating in his certificate that the ballot boxes, ballots and all papers relating to the election had been destroyed—a fact which was not controverted.

A certificate of the State Board of Canvassers: *Held* also to be void.

The ballot boxes, ballots, poll lists and statements of the Managers of Election having been destroyed after they were sent to the Commissioners of Election, that body, as a County Board of Canvassers, had authority to receive secondary evidence and grant therefrom a certificate of the result of the election.

BEFORE MAHER, J., AT BARNWELL, JULY, 1875.

This was an application to the Circuit Court for a writ of *mandamus*, and was entitled The State of South Carolina, *ex relatione* James C. Buckingham and James J. Ingram, *vs.* William A. Nerland, Clerk of the Court of Common Pleas and General Sessions for the County of Barnwell. The object of the application was to compel the Clerk to keep his office at Barnwell, he having removed the same to Blackville.

His Honor granted the writ and afterwards filed an opinion in which the facts of the case are fully stated. The opinion is as follows :

MAHER, J. This was an application for the writ of *mandnmus* to compel the respondent as Clerk of the Courts of General Sessions and Common Pleas for Barnwell County to keep his office at Barnwell.

Pursuant to an Act entitled "An Act to provide for a certain election in Barnwell County," approved March 19, 1875, an election was held on the 12th of May "to determine the will of the people as to the location of the County seat of said County." Section 2 of the Act declares "that in all respects the said election shall be held, conducted and determined as is now provided by law for the holding of elections for State and County officers," and by Section 3 it is provided : "That upon the canvassing of the votes given at such election, the Commissioners of Election shall certify to the Board of County Commissioners for said County the number of votes given for each locality, and the locality receiving the greater number of votes shall thenceforth be the County seat of said County, at which place the public offices shall be established and the Courts thenceforth be held."

The election was in all respects regularly held and conducted, and within three days thereafter the ballot boxes containing the ballots, the poll lists and the official statements of the managers of the various precincts were duly delivered to the Commissioners of Election, and were deposited in the office of the County Clerk to await the meeting of the County Board of Canvassers on the following Tuesday. Before that day these election papers and documents were abstracted and destroyed by some person or persons unknown. On Tuesday, 18th May, two of the Commissioners of Election, namely, Henry H. Easterling, the Chairman, and Joseph R. Chisolm, met and organized as the County Board of Canvassers, George A. All, the third Commissioner, not attending. Embarrassed as to the course to be pursued, they concluded to communicate with the Governor and Secretary of State, and to seek advice from the Attorney General, and with this view adjourned until the 22d of May. On that day the Board convened, the same two members being present, and All again not attending. Certain affidavits purporting to emanate from managers of the various

precincts and to set forth the result of the election at such pre-
cincts respectively, as certified in the original statements, were
offered in evidence. Upon the question of the competency of the
Board to receive and consider such testimony, argument was heard
from counsel in attendance. On consultation, the canvassers dis-
agreed, and, upon Chisolm's motion, adjourned. The proceedings
of the meeting were reduced to writing, at the Chairman's dictation,
and subscribed by himself and the Secretary. Being read by the
latter, Chisolm expressed his assent, but stated that he did not
agree to adjourn indefinitely, "Mr. All being absent," and a note
to this effect was made by the Secretary at the foot of the minutes.
Easterling then withdrew, taking with him the minutes, a copy of
which he embodied in an explanatory statement, which he caused
to be forwarded to the Governor and Secretary of State. Chisolm
remained at the place of meeting, and forthwith upon the adjourn-
ment, and even before Easterling had left the room, proceeded to re-
ceive the affidavits which had previously been tendered to the Board.
Upon these he assumed to make certain statements of the result
of the election. One of these statements was filed on the same day
with the Board of County Commissioners, and this was introduced
in evidence on the part of the respondent. From this statement
the purport and character of any other statements made and filed
or forwarded by Chisolm may be inferred. Its caption is as fol-
lows: "Evidence taken before Joseph Chisolm, one of the Com-
missioners of Election, to determine the location of the County seat
of Barnwell County, the ballot boxes, poll lists and returns of
managers having been destroyed, showing result—Affidavits from
managers of various precincts." Then follows a list of the pre-
cincts, with the number of votes in figures for Barnwell and Black-
ville respectively, at each precinct, footing up 2,271 for Barnwell
and 3,247 for Blackville, showing a majority of 976 for Blackville,
and concluding thus: "I certify the correctness of the above.
Signed, Joseph R. Chisolm, Commissioner. J. P. Strobel, Secre-
tary."

The only evidence before the Court as to the action of the State
Board of Canvassers is their original certificate of determination.
This bears date 2d June, 1875; refers to the Act by its title and to
the election held under it; states that it appears upon examination
of the returns that Blackville has received a majority of the votes
cast at such election, and then proceeds as follows: "We do, there-

fore, by virtue of the authority vested in us, certify and declare
that the town of Blackville, in the said County of Barnwell, has
been duly chosen by a majority of the voters voting at said election
to be the County seat of said County." This certificate having
been forwarded to the Board of County Commissioners, the Chair-
man of that Board caused the same to be notified to County officers
holding their offices at Barnwell, and required them to remove their
books and records to Blackville.

The respondent obeyed this requisition, and now keeps his office
at Blackville. The position of the relators is that the election was
not determined as is provided by law for the holding of elections
for State and County officers, and hence that Barnwell remains the
County seat. The respondent relies upon the certificates in evi-
dence, claiming that these are final and conclusive; that the Court
cannot go behind them in a collateral proceeding, like the present,
and inquire into the correctness of the decision expressed on their
face; and that this decision being in favor of Blackville, the Act
has operated to establish that locality as the County seat, and hence
the place where the respondent is bound to keep his office.

The case of the relators calls for no investigation by the Court
into the result of the election, nor do they controvert the proposi-
tion that the determination of Canvassing Boards is, in general,
conclusive when sought to be collaterally drawn in question.
They do not claim that Barnwell received the greater number of
votes, nor have they adduced testimony tending to establish that
fact. They concede that if, under the peculiar circumstances con-
nected with the election, the Boards of Canvassers, or the person
or persons who assumed to represent such Boards, or either of them,
were authorized by law to act in the manner they did, the result cer-
tified by them cannot be questioned. But they maintain that the
certificates did not emanate from persons having lawful author-
ity to determine this election, and that this appears from the
conceded facts in the case and from the certificates themselves.
The question, therefore, is as to the authority of the Board of
Canvassers to make and certify a valid determination of an
election in a case where all the papers appertaining to such an elec-
tion had been destroyed before the organization of either Board.
And assuming the existence of such authority, a further question
arises as to the validity of Joseph R. Chisolm's acts and certificates
in view of the circumstances under which he acted. It would

hardly be contended that the certificate of determination issued by a Canvassing Board, even though such Board may be vested with powers of final decision, is entitled to a higher degree of consideration and respect than the judgment of a Superior Court of general jurisdiction. When a judgment of such a Court is relied on and brought before another tribunal in any proceeding pending before the latter, while mere errors of judgment and irregularities of procedure on the part of the Court rendering such judgment cannot be examined into, it is always competent to inquire into the jurisdiction of such Court; and when the want of authority appears, whether it be in respect to the persons or the subject, the judgment is to be regarded as nullity. The rule is concisely stated by Trimble, J., in *Elliot* vs. *Piersol*, 1 Pet., 328: "The jurisdiction of any Court exercising authority over a subject may be inquired into in every Court where the proceedings of the former are relied on and brought before the latter by the party claiming the benefit of such proceedings."

In *James* vs. *Smith*, (2 S. C., 183,) where the subject was thoroughly discussed and the authorities collected, it was held that where a Court is without jurisdiction its judgment is void and must be so regarded whenever it comes before another Court. See also Cooley Con. Lim., 466 and 467.

1. I will proceed, then, to consider whether the County Board of Canvassers had authority to receive and act upon secondary evidence, the original papers having been destroyed before the organization of the Board. The duties of the County Board of Canvassers are defined in Chapter VIII of the General Statutes, as modified by the amendatory Act of 1875, (15 Stat., 170,) stated with reference to the election in question. The duties are substantially as follows: To count the votes of the County; within ten days aftter their first meeting, make three statements thereof, in which shall be set forth the names of the localities voted for and the number of votes given for each, written out in words at full length, each statement to be certified as correct by the signatures of the Canvassers subscribed thereto ; and, of these, one to be filed in the office of the County Clerk, or, if there be none such duly qualified, in the office of the Secretary of State, and the other two, together with the returns, poll lists and all other papers appertaining to the election, including any protest, to be forwarded by the Chairman of the Board, after a final adjournment, by a special

messenger, to the Governor and Secretary of State. It has been aleady stated that, by Section 3 of the Act under which the election was held, the Commissioners of Election were further required to file a certified statement of the same character with the Board of County Commissioners. These duties are all of a purely ministerial nature. To count votes, aggregate results, embody the same in written statements, and certify, file and forward such statements, are functions which call for the exercise of neither judgment nor discretion. Created by statute for a single occasion, to do certain things specifically enumerated, in relation to certain designated material provided to their hands, there is not a single duty enjoined upon this Board the performance of which could not be compelled by a writ of *mandamus.* In the regular progress of the business assigned to them, no occasion could arise for a resort to extrinsic proof as a necessary means of accomplishing the end of their creation.

They are not clothed with any general authority or jurisdiction in relation to the election, or in respect to rights dependent thereon. They are simply the appointed instruments through which results are ascertained from certain papers set before them for examination. The regulations of the statute are singularly clear and explicit, and there is not to be found therein a single expression to suggest that, under any circumstances, these officials would be authorized and required to act upon any other data than that which is expressly provided, or to exercise the function of reproducing lost material through the agency of secondary evidence. Their first duty is to count the votes of the County.

The law in this particular remains as it was before the Act of 1872. Whatever view the Court might entertain as to the expediency of a second count of the votes, and even conceding that complication and confusion would be likely to result in many instances from such regulation, there is no inconsistency in the two provisions so irreconcilable in its character as to work an implied repeal of the first. In strictness, therefore, it was a matter of sheer impossibility for the Board of County Canvassers to take the first step in the discharge of their duty, for it was not practicable to establish the contents of lost ballots, even if such a scrutiny would be permitted. But I am of opinion that if the certified statements of the managers had been preserved it would have been competent

to the Board to canvass the votes upon the footing of those statements and certify the result.

An essential part of their business is to ascertain the aggregate vote of the County, and although the destruction of the ballots put it out of their power to make the count, they would have had before them, in the case supposed, official statements showing the result of a count made in public, at the close of the polls, by sworn officials. There would still have been original evidence of the result, upon which, without any violation of the spirit of the law, they could, with reasonable certainty, have ascertained and certified the aggregate vote of the County. To this extent the Court would be justified in departing from the strict letter of the statute, by well-established rules of law, which, in a matter of public concern, encourage liberal construction *ut res magis valeat quam pereat.* But the case is that there was a total destruction of the evidences of the election; and the question to be determined is whether the County Canvassers had authority to receive secondary proof and act upon it. That the words of the statutes do not convey this authority is too clear to admit of dispute. It is equally clear that the implication of such authority is not necessary to the fulfillment of the duties with which the Board were specifically charged, for these presuppose the existence and presence of original documents.

The language of the law is plain and unambiguous, and, as literally interpreted, leads to no absurd results or injurious consequences. If in this particular instance serious hardship or inconvenience has ensued upon the destruction of the election papers, it is attributable not to the provisions of the statute law, but rather to the failure of the Legislature to provide for the extraordinary, if not unprecedented, event which has happened. Is the Court authorized to extend by construction the authority of the Board of County Canvassers to a case which the Legislature has not provided for, whether through design, inadvertence or the failure to give expression to their purpose? This question will be the best answered by a few citations from standard authorities, selected for the apt and concise terms in which they express doctrines which, at this day, may with propriety be termed axiomatic.

Dwarris, in considering the rule that effect cannot be given to an intention not expressed, says: "Of this rule there seems to be two branches. The first instance that may be stated is where the Legislature may have intended to provide for a particular case

and yet not have carried its intention into effect. 'We can only say of the Legislature,' said Lord Ellenborough, in Rex V: '*Shore-quod volnit non dixit.*' 'If the Legislature intended more,' said Lord Dunnan, in *Haworth* vs. *Ormerod*, 'we can only say that, according to our opinion, they have not expressed it.' Again, the subject may have been overlooked by the Legislature. A *casus omissus* can in no case be supplied by a Court of law. Judges are bound to take the Act of Parliament as the Legislature have made it."—Potter's Dwarris, 215. After citing cases in further illustration of the rule, the learned author thus sums up the authorities : " The result is, that to bring a case within the statute it should be not only within the mischief contemplated by the Legislature, but also within the fair, intelligible import of the words of the Act of Parliament."—*Ibid*, 216. Further on he remarks as follows : " If the words of a statute do not reach to an inconvenience rarely happening, they shall not be extended by an equitable construction ; for the object of statutes are mischief *quae frequentius accidunt*. It is good reason in such a case, and therefore sound construction, not to strain the words further than they reach ; but the case is to be considered *casus omissus*."—*Ibid*, 240. Discussing the question how far the consequences of a particular exposition are to be considered, he observes that heed should be given to them during the period of gestation of interpretation for the sake of avoiding absurdity, but that considerations of this kind should be disregarded when a determinate conclusion has been reached as to the meaning of the statute. He then proceeds to cite the following observations of eminent jurists: " In *Reg.* vs. *Justices of Lancashire*, Patterson, J., said: 'I cannot tell what consequences may result from the construction which we must put upon the statute, but if mischievous they must be remedied by the Legislature.' In *Rhodes* vs. *Surrethurst*, Lord Abinger said: 'A Court of law ought not to be influenced or governed by any notions of hardship ; cases may require legislative interference, but Judges cannot modify the rules of law.'"

In *Hall* vs. *Franklin*, Lord Abinger said : " We have been strongly pressed with the inconveniences that may result from the construction of the statute. We are not insensible to them; but the only proper effect of that argument is to make the Court cautious in forming its judgment. We cannot on that account put a forced construction upon the Act of Parliament."—*Ibid*, 213. See also Sedg-

wick, St. and Con., 261, 266; Broom's Leg. Max., 36, 60. "When the general intention of the statute," said Chancellor Johnston, in *Hull* vs. *Hull*, (2 Strob. Eq., 188,) "embraces the specific case, though it be not denominated, the statute may, nevertheless, be applied to it by an equitable construction in promotion of the evident design of the Legislature. But where this is done it is always presupposed that *such a case* was within their general contemplation or purview when the statute was enacted by them; for if the case be omitted in the statute because not foreseen or contemplated, it is a *casus omissus,* and the Court, having no legislative power, cannot supply the defects of the enactment. If a Judge of this State should in any instance be tempted to break through these restraining rules and to supplement defective legislation by moulding the plain provisions of a statute in conformity to his notions of right, justice or expediency, he would find an insurmountable obstacle in Section 26 of Article I of the Constitution, which he is sworn to support. In the government of this Commonwealth, the legislative, executive and judicial powers of the government shall be forever separate and distinct from each other, and no person or persons exercising the functions of one of said departments shall assume or discharge the duties of any other."

The Court is pressed to extend the authority of a Board clothed with strictly ministerial functions, upon the ground that the implication of judicial power is necessary to effectuate the end of their appointment. It is the duty of this respondent, as Clerk, to furnish an exemplification or office copy of a judgment or record in his keeping to any one applying therefor and tendering the proper fees. Would it be contended that in the case of a lost record the Clerk would be authorized to take evidence of its existence, loss and contents, and upon this to prepare and deliver the exemplification or copy? The cases seem to me to be parallel. To the end that ministerial duties may be performed, judicial authority to reproduce lost material must be implied. Such is the augument in behalf of the respondent.

If established rules are laid aside and the Constitution ignored, still there should be at least a firm persuasion in the mind of the Court that if the emergency had been foreseen the Legislature would have provided for it in the manner now proposed; that if the ballots and other election papers should be destroyed, the Board of County Canvassers would be at liberty to take proof of their contents.

It will be borne in mind, that until the passage of the Act of 1872 the only count of votes was made by this Board. Of course, no provision could be made to supply the loss or destruction of the ballots previously to the count. The case would be remediless, and, of necessity, the sole reliance must be on the vigilence of the Managers and Commissioners of Election while the ballots remained in their respective custody. But most careful provision was made against the hazard of loss or miscarriage of the official statement of the count. This is seen in the requirement that several statements be made and that those be distributed among several officials; one to be filed in the office of the County Clerk, or, in case there should be no such officer duly qualified, in the office of Secretary of State, and others to be forwarded to the Governor and Secretary of State, and, until the Act of 1872, to the Comptroller General also.

The design of these provisions is obvious. It is to preserve original evidence by multiplying its sources and depositaries. If but a single statement should be preserved the loss of the others would cause no embarrassment, and the action of the State Board of Canvassers would still be based not upon secondary evidence, but upon an original statement made immediately after the count of the votes. If so extraordinary an event should happen as the loss or destruction of all these statements, the case would be left unprovided for a *casus omnissus*. But could it possibly be supposed to have been in the contemplation of the Legislature that in such an event secondary evidence would be admissible, and that, having this in view, it was, nevertheless, considered unnecessary even to mention it? Besides the provisions of the election law have reference principally to general elections, and Section 10, Chapter VIII, of General Statutes declares that there should be one general election ticket on which shall be the names of the persons voted for as representatives in Congress and State, Circuit and County offices. How unreasonable the notion that the precise figures borne upon a statement setting forth the result of a general election could, in case of the loss of the statement, be recalled to memory, and that the testimony of witnesses would be adequate to fix with accuracy the final result; on the other hand, how wise the provision which, by increasing the number of original statements, avoids the necessity of extrinsic proof and at once closes the door against fraud and perjury, and maintains the policy of keeping ministerial boards strictly within the bounds of a limited authority.

But unfortunately when, by the Act of 1872, the managers of precincts were required to count the votes and make statements thereof, no provision was made for the execution and preservation of duplicate originals. It was no doubt owing to inadvertence that this was not done. If such provision had been made, the calamity which has occurred in this election could not have worked any disastrous results. But the point is, if the Court, yielding to the pressure of the argument in behalf of the respondent, should undertake to supply this *casus omnissus* in the way it may be presumed the Legislature would have provided if their mind had been directed to it, the inevitable conclusion must be that the County Board of Canvassers could act only upon duplicate original statements delivered to ,the Election Commissioners. It is manifest from the provisions actually made with respect to the official statements of the County Canvassers that similar regulation would have been prescribed in relation to the statements of the managers. There could be no sensible reason for leaving the proof of lost statements to depend on the perishable memory of witnesses in one instance, while in the other it was deemed so important to secure original evidence against the danger of loss or destruction.

My conclusion is, that the County Board of Canvassers were not authorized to receive and act upon secondary evidence of the contents of the election papers, which had been destroyed before the organization of the Board; and that in the absence of the ballots and the statements of the managers, the Board could not legitimately exercise their functions in this election.

II. Assuming, however, that the Board had such authority, were Chisolm's acts the acts of the Board? Upon this question I have never entertained the slightest doubt. Where a judicial authority is conferred by statute upon a specific number of persons, the law intends joint conference and concurrent action.

Considerations of convenience have availed to establish the rule that a majority may act when all, being notified of the time and place of meeting, have opportunity to attend. But in no instance where judgment or discretion is to be exercised can a less number than a majority perform the functions of the body.—3 Term, 38, 380; 6 Term, 388; Sedgwick Com. and St., 331; 12 Wallace, 398, and cases cited in note; 3 N. Y., 396. It may be otherwise where the employment is of a merely ministerial or mechanical nature. It might well be that a canvass by a single member of the County

Board of Canvassers, where the election papers are present, would be supported and in any collateral proceeding would be regarded as a mere irregularity not affecting the validity of the final certificate.—Cooley Con. Lim., 617, 618. But to take evidence of lost papers and to determine upon the weight and sufficiency of that evidence is to exercise judicial functions ; and assuming that the Board had such authority, I hold that a single member could not exercise it, and hence that Chisolm's acts were mere nullities. There was, besides, no necessity to justify his action, if, indeed, any stress of circumstances could give validity to such proceeding. Easterling was accessible and could have been compelled by *mandamus* to take his place in the Board and proceed to hear and determine if such was his clear legal duty. Thus a quorum could have been obtained and the functions of the Board set in motion. Moreover, Chisolm moved the adjournment, and, although not *sine die* in his apprehension, still it was an adjournment. Without any effort to obtain the attendance of All, the absent member, he at once proceeded to do the business of the Board of his own head, and without the co-operation of either of his associates. It is said the time limited by law had nearly expired, and immediate action was indispensable to prevent a defeat of the election. I hold that time was not essential, since the public had an interest in the duty to be peformed, and the language of the statute does not indicate that the designation of time was intended as a limitation of the power of the Board.—Sedgwick Con. and Stats., 320. Under any view which may be taken of the case, the acts of Chisolm were without even the semblance of lawful authority, and I conclude that the statements which he assumed to make and file or forward were absolutely void to all intents and purposes. From these views it follows that the County Board of Canvassers did no official act in relation to this election.

3. Next to be considered is the action of the State Board of Canvassers, and the force and effect of the certificate issued by that Board.

The duties of the State Board of Canvassers are laid down in Chapter VIII of the General Statutes, Sections 24 to 28, inclusive. After organization they are, "upon the certified copies of the statement made by the County Board of Canvassers," to proceed to make a statement of the whole number of votes given for the localities, and each of them voted for, certify such statement to be

correct, and subscribe the same with their proper names. Upon such statement they then proceed to determine what locality shall have received the greater number of votes, deciding in this connection any protest or contest that may have arisen. Finally, they make and subscribe on the proper statement a certificate of their determination, and deliver the same to the Secretary of State. Except in cases under protest or contest, the functions of this Board are as exclusively ministerial in their nature as those of the Boards of County Canvassers and precinct managers. They have the simple mechanical duty to perform of examining the certified statements transmitted from the lower Boards, and of making up from this a statement exhibiting the whole number of votes given for the respective localities; and this final determination expresses the results as regularly deduced from the face of the returns. Before entering upon the consideration of any protest or contest, they are required to ascertain the result of the election as exhibited by those returns, and to certify to the correctness of the statements in which that result is shown. If, upon the hearing of any protest or contest, a conclusion should be reached different from that indicated in such statement, it is set forth in the certificate of determination, which, of course, controls the certified statement and operates as a final judgment upon all questions of right growing out of the election.—High Ex. Rem., 48, § 57; *Grier* vs. *Shackelford*, 2 Tread., 642; Cooley Con. Lim., 623. And there is no doubt that in any case which comes regularly before the Board the determination would be equally final, at least in all collateral inquiries, although there may have been no protest or contest.— *State* vs. *Cockrell*, 2 Rich., 6. In this case there was no proess or contest. The idea that the difference of opinion between Easterling and Chisolm presented a contest within the meaning of the law is wholly inadmissible. And it is deemed sufficient to say that in no point of view in which I have been able to consider this position has it commended itself to my mind as even plausible.

The State Board of Canvassers had before them no certified statement emanating from the County Board of Canvassers, nor any return from the managers of precincts. Like the County Board, they were without a single election paper upon which they were authorized by the statute to canvass the votes and make up the general statement upon which their determination was required to be based. They had before them only the affidavits upon which

Chisolm acted and the statement which he made up from those affidavits. This statement showed upon its face that the ballots, poll lists and official returns of the managers had been destroyed before the organization of the County Board, and that the results exhibited thereon were deduced solely from the affidavits.

For reasons already stated in considering the question of the authority of the County Canvassers, I hold that the State Canvassers were not at liberty to proceed upon the papers before them; that in respect to their ministerial functions they were as rigidly restricted as the lower Board to the precise limits of the authority conferred on them by the statute; that they could not by their action impart validity to Chisolm's papers, which were absolute nullities in their inception, and, consequently, that any statement founded upon such papers must necessarily be tainted with the illegality which vitiated them.

Applying to the action of the State Canvassers the rule already adverted to in relation to the finality of judgments, their determination of this election must be regarded as null and void, because the want of authority or jurisdiction appears on the face of the record.

The judicial powers of the Board were not invoked, since there was no protest or contest, and for the further reason that there were no official papers before them to lay the foundation for the exercise of any functions whatever, whether ministerial or judicial.

And, moreover, the recitals in their certificate of determination show unmistakably that they acted exclusively upon the papers forwarded by Chisolm, and not upon any original evidence submitted to them in their character as a judicial body or Court.

They say in that certificate that " *it appears on examination of the returns* " that Blackville had received a majority of the votes, and they proceeded to declare that, " *therefore,* " Blackville was duly chosen as the County seat, etc. The only returns to which they could by any possibility have had reference were the affidavits and statement sent up by Chisolm, and these were impressed on their face with the stamp of invalidity. If, then, it be conceded that in a case circumstanced like this the Board of State Canvassers, without any election papers duly transmitted to them, might proceed as a Court to determine this election upon extrinsic testimony adduced before them, it is, nevertheless, patent upon the face of their certificate that they did not assume to act in this extraordinary capacity,

but on the contrary, treating Chisolm's papers as if they were official statements of the County Canvassers, based upon an actual count of the votes, they certified and declared this result as exhibited thereon. They professed to have exercised judicial functions as upon a case presented to them in the character of a substantive tribunal acting independently of the lower Board, nor indeed even to have considered and passed upon the authenticity, weight and sufficiency of the affidavits transmitted by Chisolm. They simply affirm his conclusions, and give, so far as it was in their power to give, their official sanction to his proceedings by adopting them as the basis of their determination. The Supreme Court, in the cases of the *State, ex rel.* the *Attorney General, vs. Walker,* Sheriff, and *Nerland,* Clerk, (May, 1874,) had occasion to define the functions of these Boards of Canvassers, in an election similar to the one now under consideration. Mr. Justice Willard, in delivering the opinion of the Court, made the following observations: "Under our laws there are two bodies entrusted with the power to ascertain and fix the fact of an election for State and County purposes— the one acting as a primary tribunal, the other as a revising body. The Board of County Canvassers is the primary body, and the Board of State Canvassers is the revising body. To say that the election fails unless a proper declaration is made by the Board of State Canvassers is to destroy entirely the functions of the County Board. On the other hand, to allow the Board of County Canvassers to make a declaration and determination valid and conclusive unless revised and modified by the revising body is to give to each body a distinct, important and entirely consistent function, in harmony with the method by which we are accustomed to fix the existence of facts on which legal rights are based."

In these cases the State Canvassers having declined to act upon the returns of an election to determine the location of the County seat of Barnwell County, the question was whether the election had been legally determined. The Court held that the determination by the Board of County Canvassers, not having been reversed or modified by the Board of State Canvassers, was final and conclusive. In the present case there has been no determination by the Board of County Canvassers, and, according to the opinion of the Court already expressed, no such determination was possible under the circumstances. Yet it is gravely contended that a revising body, without any subject for revision before them, had authority to make a valid

determination, and that their certificate is final and conclusive. The proposition seems to me to be irreconcilable with the views and decision of the Supreme Court in the case just cited. To my apprehension it is perfectly clear that a determination by the County Canvassers is, in all cases, indispensable to ground the jurisdiction of the State Board of Canvassers. And it is especially so in view of the provisions of the Act under which the election was held. It is there expressly directed that the Commissioners of Election shall, upon the canvassing of the votes, certify to the Board of County Commissioners the number of votes given for each locality, and the Act declares that the locality receiving the greater number of votes shall *thenceforth* be the County seat. The importance of this certificate is obvious. To do away with it by construction would be grossly unwarrantable. It emanates from the Commissioners of Election, a body distinct from the State Board of Canvassers, and even from the County Board of Canvassers, though the latter is composed of the same individuals. [See Sections 2 and 15, Chapter VIII, General Statutes, as to the repetition of the statutory oath.] That certificate has not been filed, and, under the circumstances, no valid certificate could have been filed. The certificate of the State Board of Canvassers cannot supply the place of the certificate required by the Act, because it neither emanates from the proper source nor sets forth the number of votes given for each locality.

The general conclusion is, that the Act has not taken effect to establish the County seat elsewhere than Barnwell.

There has been no determination of the election duly certified in the manner imperatively required by the Act as the condition upon which it should go into operation and effect. Barnwell therefore remains the County seat of Barnwell County, and, consequently, it is the duty of the respondent to keep his office at that place. In the view taken by the Court, it has not become necessary to pass upon the constitutionality of the Act of March 19th, and, therefore, it is considered that any expression of opinion on that question would not be proper.—Cooley Con. Lim., 163.

The Court is entirely free from doubt as to its jurisdiction in this case. By Section 15 of Article IV of the Constitution, power is expressly conferred upon Courts of Common Pleas to issue writs of *mandamus,* and in *McIver* vs. *The State* (2 S. C., 1,) it was held that the jurisdiction formerly vested in Courts of Sessions in the

proceeding by *mandamus* had been transferred by the Constitution to Courts of Common Pleas. The order directing the writ to issue in pursuance of the prayer of the petition has already been filed.

The respondent appealed.

*Bellinger, Thomson, Elliott, Dunbar & Stewart,* for appellant:

This is an appeal from an order of His Honor Judge Maher, setting aside the certificate of the State Board of Canvassers declaring the result of the election for the location of the County seat of Barnwell County, held under and by virtue of Act of Assembly, approved March 19th, 1875, entitled "An Act to provide for a certain election in Barnwell County."

1. The Circuit Court cannot review the action of the State Board of Canvassers by *mandamus.* The Court of Common Pleas has only a limited jurisdiction in *mandamus.*—Constitution, Art. IV, § 15; High on Ex. Legal Remedies, pp. 98, 581, 582, and notes.

A new jurisdiction has been conferred on Common Pleas.— *McIver* vs. *The State,* 2 S. C., 1. Must be strictly construed.— *McNamee* vs. *Waterberry,* 4 S. C., 167–8., opinion of C. J. Supreme Court alone has right of review.—Const., Art. IV, § 4.

2. Even if such power in Common Pleas, it is vested in the Court alone, and *ultra vires* of a Circuit Judge at Chambers to exercise it.—Const., *ibid.*

3. If Circuit Court cannot review the action of State Board directly, neither can it collaterally.—High, 57, 75, 77.

Decision of State Board final.—Revised Statutes, p. 32, § 26; *Grier* vs. *Shackleford,* 3 Brevard, 491.

4. Duty of party against whom writ is sought must be plain.— High, 79, 32, 41. Nor granted where it would place parties in conflict with order of another Court.—High, 23.

5. It is immaterial in what way the choice at an election is discovered.—*Day* vs. *Kent,* 1 Oregon. If votes of the citizens are deposited, the intent and design of an election are accomplished.— *Andrews* vs. *Sancier,* 13 La. Ann., 301.

6. If the manner in which the popular will is determined be immaterial, the *media* through which that will is announced is still less material. Any other view would be unwise and impolitic.— *Commonwealth* vs. *Reed,* Brightley's Election Cases, 126; 2 Ashmead, 261; *Howard* vs. *Shields,* Ohio Leading Cases on Elections,

378; *State* vs. *Bancroft et al.,* 2 Wis., 579; *State* vs. *Ferguson,* 2 Vroom, (N. J.,) 107.

Statutory rules for holding elections *directory.—McKinney* vs. *O' Connor,* 26 Texas, 5; *Brit* vs. *Cook,* 14 Barb., 230; *People* vs. *Shunerhorn,* 19 Barb., 558; Cooley Lim., 75.

7. The absence of jurisdiction in State Board not apparent on face of certificate or other proceeding herein. The *ratio decidendi* and material thereof never before Circuit Court, but on file in Secretary of State's office. The case was decided by State Board upon contest.

8. Express jurisdiction given by the Act in question, and interpreted by the medium of *The State* vs. *Chairman of County Commissioners.*—4 S. C., 485.

General tendency to construe Art. II, Sec. 20, liberally.

The evil designed to be remedied or avoided by this provision was *hotch-potch* or *log-rolling* legislation.—Cooley, 143–4.

Generality of title no objection, so long as not a cover to legislation incongruous in itself.—*Ibid,* and cases there cited. See also *Morton, Bliss & Co.* vs. *Comptroller General,* 4 S. C., 430.

*A. P. & R. Aldrich, Hutson, Hoge & Wilkes,* contra.

February 16, 1876. The opinion of the Court was delivered by

MOSES, C. J. We concur with his Honor the Circuit Judge in holding that the determination of the Board of State Canvassers in regard to the election referred to in the pleadings was without authority of law. It proceeded entirely upon the papers transmitted to that body by Chisolm, one of the Commissioners. They were not, in any respect, official in their character, and afforded no competent testimony upon which the State Board could act. While we are, therefore, obliged to refuse the motion to set aside the order from which the respondents have appealed, we are not to be considered as concurring with the Judge in his conclusion against the right of the Commissioners of Election, on the abstraction and destruction of the boxes, together with the ballots, the poll lists and the official statement of the managers of the various precincts, to ascertain and certify the result from secondary evidence of the lost statements, through the medium of which action the State Board could render " a valid determination."

The object of the Act was to fix the County seat for Barnwell County through the will of the people, to be ascertained by an election to "be held, conducted and determined as now provided by law for the holding of elections for State and County officers." By the third Section, "upon the canvassing of the votes given at such election, the Commissioners of Election shall certify to the Board of County Commissioners for said County the number of votes given for each locality, and the locality receiving the greatest number of votes shall thenceforth be the County seat of said County, at which place the public offices shall be established and the Courts thenceforth held." The duty of the Commissioners of Election was to ascertain the will of the people as expressed through their ballots. All that is necessary to effect the purpose proposed by their appointment must be implied from the character of the duty required of them and the end which the Legislature proposed to attain through the Act. The third Section imposes upon the Commissioners the duty of canvassing the votes and certifying to the Board of County Commissioners for said County the number given for each locality. The existing law required the Chairman of the Board of Managers at each precinct to deliver to the Commissioners of Election the poll list, box containing the ballots and a written statement of the result of the election in his precinct.

The term employed to designate the duty to be performed by the Commissioners would seem to impose an obligation beyond that of merely counting the ballots and comparing the statements of the managers. Canvassing implies "search," "scrutiny," "investigation," "examination." But whatever may be the duty of the Commissioners, they were imposed with a view by the Legislature to the fulfillment of the object intended by the Act, to wit, the ascertainment of the election from the ballots and statements returned to them by the several managers. If the intention of the maker can be clearly inferred from a general view of the whole statute, without doing violence to the particular words he has employed, it is the duty of the Court to give it effect, for otherwise his will would be disappointed and defeated. "Such construction should be put upon a statute as may best answer the intention which the maker had in view, for '*qui hæret in litera, hæret in cortice.*"—Plowd., 232; *William* vs. *Barkley,* 11 Rep., 73. "A thing which is in the intention of the maker of a statute is as much within the statute as if it were within the letter."—*Zouch* vs.

# SUPREME COURT.

*Stowell,* 10 Rep., 101. So, on the other hand, "things which are within the words of statutes are not within the purview of them, which extends no further than the intent of the makers, the principal thing to be considered."—Dwarris on Stat., 726.

Such a construction, too, shall be put upon a statute "as does not suffer it to be eluded."—3 Rep., 7; Magdalen College Case, 11 Rep., 72; 2 Rol., 127. "In the construction of statutes the ends contemplated are to be considered."— *Curlin* vs. *Chalken,* 3 M. and S., 510; *Andre* vs. *Fletcher,* 2 T. R., 161. "So the ground and cause of the making of a statute explain the intent."—Pl. Com., 173, 204. And "a statute which concerns the public good ought to be liberally construed."—Strange, 517, 518, 519.

Applying these principles, which must be recognized and respected by reason of the high authority from which they emanate, is there anything in the Act which necessarily restricts the Commissioners to a mere determination of the election by counting the votes and comparing the statements, and thus prevent them from carrying out its design, if after the votes have been counted at the respective precincts they with the poll lists and statements should be entirely destroyed? If, consistently with the rules of law, an attempt thus to outrage the will of the people, expressed in conformity with an Act of the Legislature, can be counteracted, it is the duty of the Court to interfere by the application of such legal principles as will authorize the introduction of secondary proof in substitution of that which, by its wanton destruction, cannot be resorted to.

The appointment of the Commissioners was not with a view to the conduct of the election, which was to be held and managed by persons named for that purpose, who were required to count the votes at the several precincts and make a written statement of the polls. The result of the whole vote was to be ascertained by the Commissioners and certified to the Board of County Commissioners, and the locality having the greater number of votes was thenceforth to be the County seat. The votes for each locality were to be determined by an actual count by the Commissioners of Election; but if this became impossible, not because of the default or neglect of the managers, but of the willful destruction of the ballots, we cannot see how the Commissioners, whose special duty it was to ascertain the result of the election, could not resort to secondary proof to reach the only end the Act had in view. Although the

opinion of the learned Circuit Judge is strongly opposed to such action on the part of the Commissioners, yet it admits the right by holding "that if the certified statement of the managers had been preserved it would have been competent to the Board to canvass the votes upon the footing of these statements and certify the result." If the action of the Commissioners was confined only to the actual count of the votes, in the absence of this would not any proof be only of a secondary character? The statements of the managers, if the votes could be counted by the managers, who by their own "canvassing" could discover the exact number for each locality, and thus from such count have primary and positive knowledge, would only be secondary evidence of the fact, first coming to their certain knowledge from the count itself. If "a statute which concerns the public" is to be so strictly construed as to give effect to the form of the proceedings by which the purpose of the Legislature is to be attained at the sacrifice of the only object they proposed to accomplish by their enactment, it may well be said that the Court conceded greater consequence to the shadow than the substance. The policy of a statute should be respected by the Courts, and strictly enforced if it can be done conformably to law.

In a government founded on the will of the people, their voice is not to be stifled by fraud, or their high behests frustrated by wrong and violence. If the purpose of the State, expressed in constitutional form, to provide a County seat through an election of qualified voters is to be set at naught by the destruction of the ballots, those charged with the ascertainment of the result of such election must resort to secondary evidence to enable them to determine it. The right follows, as an implication so necessary to the execution of the duty imposed, that, unless it is utterly inconsistent and irreconcilable with the words of the Act, it must be resorted to, so that full and complete effect may be given to the design of the Legislature, and its defeat prevented by fraud and violence.

For the reason herein already stated, the motion, however, must be dismissed, and it is so ordered.

WRIGHT, A. J. I concur in the judgment as pronounced by the Chief Justice; also with the views expressed by him in reaching such judgment.

This being a case of vital importance to the people of the whole State, if the record contains sufficient to warrant this Court to so

largely and fully express its views concerning the mode of procedure after an election held, I deem it highly proper that it should be done, that all persons who may be interested in the event of any election hereafter may take heed and act in such a manner as not to obstruct or throw any obstacle in the way of obtaining a air and true expression of the will of the people.

The points discussed in the opinion of the Chief Justice are expressly raised in the judgment of the Court below; and, accordng to-the Constitution, I regard it as being the duty of this Court, whenever it reverses or affirms a judgment, to consider and decide every point made and distinctly stated in the cause, and to give in writing the reasons therefor.

WILLARD, A. J. I concur in the judgment just pronounced by the Chief Justice, but upon the ground alone that the action of the State Canvassers was unauthorized for want of precedent action on the part of the County Canvassers. I do not think that we can with propriety examine the question as to what evidence of the results of the election is competent to control the action of the County Board. Had they met and acted in form, but neglected some substantial duty imposed upon them in virtue of their office, a case would have been presented calling upon this Court for its judgment. But they wholly failed to exercise their legal functions in the case under consideration. The question before us does not directly involve the legality of their action but that of the State Canvassers, who assumed to disregard the want of action on the part of the local Board and to make an independent declaration of the results of the election. We are all agreed that this cannot be done consistently with the laws fixing the duties of the State Canvassers.